UNITED STATES of America,
Plaintiff-Appellee,

v.

Clarke Raymond MOORE and John Bernard Spelz, Defendants-Appellants.

No. 71–1212.

United States Court of Appeals,
Sixth Circuit.

Dec. 14, 1971.

H. Louis Sirkin, and William B. Davis, Cincinnati, Ohio, for appellants.

Kenneth G. Haynes, Dept. of Justice, Washington, D. C. (Eugene E. Siler, Jr., U. S. Atty., Lexington, Ky., James J. Tansey, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and WEICK and EDWARDS, Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal from a conviction for manufacturing and possessing depressant or stimulant drugs, following a jury trial and the denial of a motion for a new trial.

Clarke Moore, John Spelz, and Charles Reinking were indicted for conspiring to knowingly manufacture, compound, process and process for sale, depressant or stimulant drugs; to wit: diethyltryptamine, in violation of Title 21, U.S.C. § 331(q) (1) (Count 1) and unlawfully and knowingly engaging in the manufacture of diethyltryptamine, a depressant or stimulant drug, in violation of Title 21, U.S.C. §§ 331(q) (1); 321 (v) (3) and 21 C.F.R. 166.3 (Count 2).[1]

Spelz was also indicted for violation of 21 U.S.C. §§ 331(q) (3), 360a(c), by un-

---

[1]. At the time of their commission, the offenses charged were misdemeanors. Section 331(q) was repealed by The Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L.No. 91–513, § 701(a), 84 Stat. 1236, 1281. The offenses are now felonies. 21 U. S.C. §§ 841, 846.

lawfully and knowingly possessing dimethyltryptamine, a "depressant or stimulant drug" within the meaning of Title 21, U.S.C. § 321(v) (3) and 21 C.F.R. 166.3 (Count 3) and unlawfully and knowingly possessing chloral hydrate, a "depressant or stimulant drug" within the meaning of 21 U.S.C. § 321 (v) (3), 21 C.F.R. 166.3 and 26 U.S.C. § 4744(a) (1) (Count 4).

The facts, although somewhat technical, are largely undisputed. On March 31, 1968, federal agents executing a search warrant entered commercial premises in Covington, Kentucky. They found Moore and Spelz standing over a 30 gallon plastic can containing 3–indolediethylglyoxylamide. The can was resting on an ice bed and its contents were being agitated by an electric mixer. They also found a large quantity of laboratory apparatus, numerous chemical reagents, including diethylamine and lithium aluminum hydride, approximately 500 parsley cigarettes, loose parsley, a paint sprayer, a chemistry handbook, a bottle containing chloral hydrate and a bottle containing a small quantity of dimethyltryptamine. Reinking was discovered in an adjacent room washing laboratory glassware.

The building was leased to Spelz. He had purchased, directly or through agents, everything on the premises. Some of the chemicals had been purchased through a Chicago mail-drop in the name of Ansonia Associates by the stamped signature of Thomas Anderson, a fictitious name. Moore, through the efforts of a Chicago acquaintance, had made arrangements for the mail-drop, had forwarded Spelz's orders for chemicals to be delivered to the mail-drop, and had picked up chemicals at the mail-drop and transported them to the laboratory in Covington.

The record contains Government testimony that hallucinogens such as diethyltryptamine (DET) and dimethyltryptamine (DMT) can be ingested by smoking parsley cigarettes which have been soaked in or sprayed with the hallucinogen. The Government also introduced, as Exhibit 11, documents denominated "SYNTHESIS OF N, N–DIMETHRYLTRYPTAMINE (DMT)" and "SYNTHESIS OF TRYPTAMINES." These documents described the procedures and chemicals required for the production of DMT and tryptamines, respectively. DMT is a species of the genus tryptamine. Government agents testified that Exhibit 11 was found on a laboratory table near the plastic can.

Expert testimony by Government chemists, supported by cross examination of the defense chemist, showed that addition of lithium aluminum hydride to the contents of the can would yield DET. Exhibit 11 showed, as a final step in the production of DMT, the addition of lithium aluminum hydride to the final intermediate, 3–indoledimethylglyoxylamide. The testimony further revealed that the synthesis of DET and DMT were essentially identical except that diethylamine was used to produce DET while dimethylamine was used to produce DMT and that following the synthesis outlined in Exhibit 11 with diethylamine would yield 3–indolediethylglyoxylamide as the final intermediate.

Spelz and Moore testified that Spelz was engaged in basic organic chemistry research. They denied any connection with or knowledge of Exhibit 11. Cross-examination of Government chemists and direct examination of the defense chemist showed that, by following known procedures with various chemicals, the contents of the can could yield a vast number of organic compounds. Specific patents were introduced as representative of such procedures. Reinking did not testify and was acquitted.

Following a verdict finding them guilty, Moore and Spelz filed a motion for a new trial, alleging that Exhibit 11 was in Reinking's car at the time of the raid. The motion was denied without hearing.

Moore and Spelz attack their conviction on the following grounds: (1) that the search warrant was not based on probable cause; (2) that Exhibit 11 was

not listed on the return; (3) that the verdict is unsupported by the evidence; and (4) that motion for a new trial should have been granted because the verdict is based on perjured testimony.

## I

The search warrant was supported by the affidavit of Agent Wysor, which is made an Appendix to this opinion. The fourth amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." The principles for evaluating supporting affidavits are well established:

"[A]ffidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." United States v. Ventresca, 380 U.S. 102, 108, 85 S. Ct. 741, 746, 13 L.Ed.2d 684 (1965). Accord, United States v. Harris, 403 U.S. 573, 577, 91 S.Ct. 2075, 29 L.Ed. 2d 723 (1971).

Probable cause is made out where:

"[T]he facts and circumstances within [the agents'] knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that [a crime is being committed]." Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925).

■ We have reviewed the affidavit and hold that it contains facts from which the Commissioner who issued it appropriately could have found probable cause. The affidavit sets forth the delivery of known precursors used in the manufacture of hallucinogens to a Chicago mail-drop, the use of fictitious names in the ordering of chemicals, the transportation of the chemicals from the mail-drop to Covington, the activities within the building outside normal working hours, and the odor of ether emanating from the building. We hold that these facts constitute probable cause for the Commissioner to believe that the crime of manufacturing hallucinogenic drugs was being committed inside the premises.

■ Appellants contend that the affidavit is largely hearsay and is defective in that it fails to set forth underlying facts upon which the hearsay may be credited. "[A]n affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant," Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964), so long as "a substantial basis for crediting the hearsay is presented." Jones v. United States, 362 U. S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960). A reasonable reading of the affidavit shows that the above facts were obtained by Government investigation and surveillance, rather than tips from unnamed informants. A substantial basis for crediting the hearsay is thus established. See United States v. Jensen, 432 F.2d 861 (6th Cir. 1970); United States v. Plemmons, 336 F.2d 731, 734 (6th Cir. 1964).

## II

■ It is further contended that Exhibit 11 should have been excluded because it was not included in the inventory accompanying the return of the warrant.[2] Appellants cite no authority

2. "(d) Execution and Return with Inventory. The warrant may be executed and returned only within 10 days after its date. The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or

in support of this position. Although it is clear that the return of the warrant is ministerial and any failure therein does not void the warrant, *e. g.,* Rose v. United States, 274 F. 245, 250–251 (6th Cir.), cert. denied, 257 U.S. 655, 42 S.Ct. 97, 66 L.Ed. 419 (1921), the precise issue presented appears to be of first impression at the Court of Appeals level.[3] Appellants urge that the failure to include the item on the inventory, while not sufficient to invalidate the warrant, requires exclusion of the items omitted. They have failed to demonstrate that the failure to list Exhibit 11 was prejudicial. The record shows that defense counsel had an adequate opportunity to cross-examine the agents as to the location of Exhibit 11 and the reason for its omission, explored the possibility that the document was in an automobile outside the laboratory, and contested its association with the defendants. Defense counsel did not claim surprise at its introduction or request additional time to meet this evidence. Without such a showing, we decline to hold the admission of Exhibit 11 to have been reversible error.

### III

■■ The attack on the verdict as unsupported by the evidence is based on the fact that no DET was found on the premises. It is argued that the Government's proof requires an inference that appellants were manufacturing DET followed by an inference that they intended to sell the DET so made. We note at the outset that counts 1 and 2 charge manufacture of DET, not possession. Proof of manufacturing does not require that the drug actually was produced. In resolving this issue, the evidence and the legitimate inferences to be drawn therefrom must be viewed in the light most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ; United States v. Wolfenbarger, 426 F.2d 992 (6th Cir. 1970). While it is undisputed that the contents of the can could have been used to produce a virtually limitless number of legal products, the immediate presence of the instructions of Exhibit 11 and of the chemical required for the final step of the synthesis described therein, when coupled with the secretive manner in which the chemicals were procured and the lack of notes and apparatus supporting Spelz's explanation of basic research, warrants an inference that DET was being manufactured. The large quantity of material in the can[4] considered together with the expert testimony concerning the methods of ingesting hallucinogens and the presence of parsley cigarettes further warranted an inference of an intent to sell. *See* United States v. Ortiz, 445 F.2d 1100, 1104–1105 (10th Cir. 1971). Accordingly, we find the evidence sufficient to support the verdict on counts 1 and 2.

■ We reach a different result, however, as to the conviction of Spelz under counts 3 and 4. These counts charged Spelz with unlawful possession of DMT and chloral hydrate. The evidence showed a small amount of DMT present in one bottle and that the chloral hydrate was in one sealed drugstore bottle bearing a label correctly identifying its con-

---

shall leave the copy and receipt at the place from which the property was taken. The return shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the applicant for the warrant and the person from whose possession or premises the property, was taken, if they are present, or in the presence of at least one credible person other than the applicant for the warrant or the person from whose possession or premises the property was taken, and shall be verified by the officer. The judge or commissioner shall upon request deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant." R. 41(d), Fed.R.Crim.P.

3. The position of appellants has been rejected at the district court level. *See* United States v. Greene, 141 F.Supp. 856, 858–859 (D.D.C.1956).

4. The Government chemist testified that the contents of the can could produce approximately 22,000 doses of DET.

tents. Under the law in effect at the time of the arrest, the simple possession of DMT or chloral hydrate was not illegal; the burden of proof was on the United States to show that the possession by Spelz did not come within one of the statutory exceptions.[5]

The record contains no evidence of an intent to sell the drugs described in Counts 3 and 4, and no facts from which a permissible inference of intent to sell could be drawn by the jury. We have summarized above the evidence supporting the conclusion that the drugs in process of being manufactured as charged in Counts 1 and 2 were intended for sale. No such evidence is in the record with respects to Counts 3 and 4.

■ We therefore hold that there is not sufficient evidence in the record from which the jury could have found Spelz guilty beyond a reasonable doubt under Counts 3 and 4. The judgment of conviction of Spelz under these two counts therefore must be reversed.

## IV

■ Appellants' motion for a new trial was based on the allegation that Exhibit 11 was in Reinking's car at the time that the building was entered by government agents. However, the record shows that defense counsel did not provide an affidavit in support of the allegation,[6] did not represent that such support was forthcoming or explain any reasons for a lack of support, and did not request a hearing on the motion. Under these circumstances, the denial of the motion was not an abuse of discretion and will be affirmed. *Cf.* United States

v. Crowder, 351 F.2d 101, 104–105 (6th Cir. 1965).

Affirmed as to the convictions of both appellants under Counts 1 and 2; reversed as to the conviction of Spelz under Counts 3 and 4.

## APPENDIX

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

Commissioner's Docket No. 2
Case No. 166

## UNITED STATES OF AMERICA
vs.
Green Brick Constructed Building W/Green Shingled Roof Known As 413 E. 17th Street, Covington, Kentucky and Occupied by Southern Scientific Co.

## AFFIDAVIT FOR SEARCH WARRANT

Eastern District of Kentucky
Filed Apr. 17, 1968
Davis T. McGarvey, Clerk
U.S. District Court

Before Robert Cetrulo [Commissioner], Covington Kentucky.

The undersigned being duly sworn deposes and says:

That he has reason to believe that on the premises known as 413 E. 17th Street, Covington, Kentucky, in the Eastern District of Kentucky, there is now being concealed certain property, namely hallucinogenic drugs, to-wit: Diethyltryptamine and Dimethyltryptamine,

---

5. "(c) No person, other than a person described in subsection (a) or subsection (b) (2), shall possess any depressant or stimulant drug otherwise than (1) for the personal use of himself or of a member of his household, or (2) for administration to an animal owned by him or a member of his household. In any criminal prosecution for possession of a depressant or stimulant drug in violation of this subsection (which is made a prohibited act by section 301 (q) (3)), the United States shall have the burden of proof that the possession involved does

not come within the exceptions contained in clauses (1) . . . ." Drug Abuse Control Amendments of 1965, Pub.L.No. 89–74, § 3(b), 79 Stat. 226, 229 (codified at 21 U.S.C. § 360a(c), repealed 1971). Simple possession of these drugs is now illegal. 21 U.S.C. § 844.

6. The affidavits presented to this court were prepared approximately six months after the motion was denied and have never been considered by the District Judge.

commonly known as DET and DMT; and certain paraphernalia and chemical precursors utilized in the illicit manufacture of said drugs, which are the means and instrumentalities used to commit offenses in violation of 21 U.S.C. § 331(q) (1) and (3) and which are also subject to seizure and condemnation under 21 U.S.C. § 334(a) (2).

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

(SEE ATTACHED, WHICH IS MADE A PART OF THIS AFFIDAVIT)

/s/ Chantland Wysor, Agent, Bureau of Drug Abuse Control

Sworn to before me and subscribed in my presence, March 31, 1968.

/s/ Robert C. Cetrulo, U. S. Commissioner

During the first part of March, 1968 the Chicago Field Office of the Bureau of Drug Abuse Control received information from the New York Field Office, Bureau of Drug Abuse Control, reporting that a firm using the name of ANSONIA ASSOCIATES, 100 N. LaSalle Street, Chicago, Illinois, allegely (sic) a Cosmetic Firm, had ordered a large quantity of chemical precursors which are known to be used in the illicit manufacture of hallucinogenic drugs, within the meaning of the Drug Abuse Control Amendments of 1965.

Investigation then revealed the following as regards ANSONIA ASSOCIATES: Responsible person in this alleged firm is Thomas R. Anderson and it was later determined that this individual's true identity may possibly be CLARK MOORE and that the name ANDERSON is fictitious. Investigation shows that the address listed for this firm is an answering service which has been contracted to accept all telephone calls, correspondence and parcels. Persons associated with ANSONIA who transact business with the answering service are CLARK MOORE and RUTH TERRY. Investigation revealed that Moore is a resident of Columbus, Ohio

and Terry is a resident of Chicago, Illinois. During the month of March, 1968 the answering service received parcels containing chemical precursors for utilization in the manufacture of hallucinogenic drugs, to be held for CLARK MOORE. Inquiry with the U. S. Food and Drug Administration revealed that this firm is not of record with that Agency as a legitimate cosmetic firm.

Further investigation determined that arrangements had been made for CLARK MOORE to travel from Columbus, Ohio to Chicago, Illinois on March 29, 1968 to pick up the chemical precursors, which were being held for ANSONIA ASSOCIATES. Surveillance determined that MOORE did arrive in Chicago on March 29, 1968 and that on March 30, 1968 the subject did pick up the chemical precursors. Continuous surveillance on subject MOORE by Agents of the Bureau of Drug Abuse Control determined that the subject did leave Chicago on March 30, 1968 with the chemical precursors in his vehicle and delivered the items to Southern Scientific Company, 413 E. 17th Street, Covington, Kentucky, on that same date. After remaining inside 413 E. 17th Street for a short period of time subject MOORE left the rear of the building, walked to an alleyway behind the building and placed a cardboard container on the ground. Examination of that container revealed that it was empty and had labeled thereon "American Indole", which is a common precursor utilized in the illicit manufacturing of hallucinogens.

Surveillance determined that subject MOORE an individual tentatively identified as JOHN SPELZ, and an unknown person, were inside Southern Scientific Company from 7:30 PM to 11:30 PM, on March 30, 1968; this being a Saturday and if the firm is legitimate these are not normal working-business hours. Surveillance again determined that the same three subjects went to the building on Sunday, March 31, 1968, at approximately 11:00 AM.

Indications that persons at Southern Scientific Company are engaged in the

illegal manufacture of Hallucinogenic Drugs are: Unusual manner utilized in ordering, receiving and ultimate delivery of chemical precursors, which is a known Modus Operandi used by individuals engaged in the illicit manufacture of hallucinogenic drugs; the unusual activity at the building not during normal working-business hours; it is known that the chemical precursors in question are utilized in the illicit manufacture of Diethyltryptamine (DET) and Dimethyltryptamine (DMT), which hallucinogenic drugs within the meaning of the Drug Abuse Control Amendments of 1965; it is a known factor that ether is utilized in the illicit manufacture of DET and DMT; and during surveillance of said location on Sunday, March 31, 1968, surveillance Agents could smell strong odors coming from the building in question which is believed to be ether. In addition it is known that the chemical precursors obtained are not common in the manufacture of cosmetics.

/s/ Chantland Wysor, Agent Bureau of Drug Abuse Control

Sworn to before me, and subscribed in my presence this 31st day of March, 1968.

/s/ Robert C. Cetrulo, Commissioner